UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EDWARD CURE, individually, and as a representative of a Class of Participants and Beneficiaries of the FM Global 401(k) Savings Plan, <br><br> Plaintiff, <br><br> v. <br><br> FACTORY MUTUAL INSURANCE COMPANY, BOARD OF DIRECTORS OF FACTORY MUTUAL INSURANCE COMPANY, and FACTORY MUTUAL INSURANCE COMPANY RETIREMENT COMMITTEE, <br><br> Defendants. | Case No. 1:23-cv-12399 <br><br> Class Action Amended Complaint For Claims Under 29 U.S.C. § 1132(a)(2) |

**AMENDED CLASS ACTION COMPLAINT**

COMES NOW Plaintiff, Edward Cure ("Plaintiff"), individually and as representative of a Class of Participants and Beneficiaries of the FM Global 401(k) Savings Plan (the "Plan" or "FM Global Plan"), by his counsel, WALCHESKE & LUZI, LLC, and JONATHAN M. FEIGENBAUM, ESQ., as and for a claim against Defendants, alleges and asserts to the best of his knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

**INTRODUCTION**

1. Plaintiff is a "participant" in a defined-contribution plan under ERISA Section 3(7), 29 U.S.C. § 1002(7): the FM Global 401(k) Savings Plan (the "Plan" or "FM Global Plan".)

2.      The Plan is a Section 401(k) "defined contribution" pension plan under 29 U.S.C. § 1002(34), meaning that contributions by his former employer, Factory Mutual Insurance Company ("FM Global"), to the payment of Plan costs is guaranteed but the retirement benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l,* 575 U.S. 5, 525 (2015.)

3.      As a defined-contribution plan, the Plan allows participants to direct the investment of their contributions, but the investment options included in the Plan are selected by the Plans' fiduciaries, as are the Plan service providers.

4.      FM Global, through its Board of Directors, are the Plan Sponsors and fiduciaries of the Plan. FM Global and its Board of Directors assigned fiduciary management and administrative duties to the Factory Mutual Insurance Company Retirement Committee ("Plan Committee") and to their members.

5.      After careful consultation with experts and review of publicly available documents, Plaintiff alleges four ERISA violations against Defendants: a violation of the duty of prudence against the Plan Committee under 29 U.S.C. § 1104(a)(1) for charging excessive total recordkeeping and administrative ("RKA") fees to Fidelity and other non-Fidelity service providers; a violation of the duty of prudence against the Plan Committee under 29 U.S.C. § 1104(a)(1) for maintaining underperforming investments; and two claims against FM Global and its Board of Directors for failure to monitor fiduciaries on the Plan Committee with regard to Plan total RKA fees and underperforming investments.

6.       Count I alleges breach of fiduciary duty of prudence by Defendant Plan Committee for incurring unreasonable and imprudent total RKA fees. Among other things, Defendant Plan Committee paid over 139% premium per-participant for total RKA fees for the Plan to the Plan

recordkeeper, Fidelity Investments Institutional ("Fidelity"), as well as to other non-Fidelity service providers, during the Class Period. Defendant Plan Committee should have lowered its total RKA expenses by soliciting bids from competing providers for materially similar RKA services and using its massive size and correspondent bargaining power to negotiate for fee rebates, but it did not do so or did so ineffectively, given the excessive RKA fees paid.

7.      Count II alleges a breach of fiduciary duty of prudence by Defendant Plan Committee for imprudently maintaining the underperforming American Fund Europacific Growth Fund R6 and the active suite of Fidelity Freedom Funds. By maintaining these Funds, Defendant Plan Committee cost Plan participants tens of millions of dollars during the Class Period. Defendant Plan Committee should have replaced these target date funds on the first day of the Class Period on October 17, 2017. Defendant Plan Committee inexplicably have had these funds in the Plan going back to at least 2010, according to Plan 5500 Forms, depriving participants of compounded returns through these investments in underperforming funds.

8.      Counts III and IV allege a breach of fiduciary duty by FM Global and its Board for failing to monitor those members of the Plan Committee responsible for paying reasonable Total RKA and for not removing at the beginning of the Class Period the underperforming challenged funds.

9.      Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

10.      "In determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Tibble*, 575 U.S. at 528–29. The Supreme Court has stated that "a trustee has a

continuing duty to monitor trust investments and remove imprudent ones ... separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Id.* at 529. "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 742 (2002) (citing *Tibble*, 575 U.S. at 529–30). This continuing duty to monitor is a subset of the duty of prudence, *Tibble*, 575 U.S. at 529–30, and includes two related components. *See Hughes v. Northwestern University*, 63 F.4th 615, 626 (7th Cir. 2023) ("*Hughes II*").

11.    First, the duty of prudence requires a plan fiduciary to systematically review its funds both at the initial inclusion of a particular fund in the plan and at regular intervals to determine whether each is a prudent investment.

12.    Second, the duty of prudence requires a plan fiduciary to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." *Tibble*, 843 F.3d at 1197 (quoting RESTATEMENT (THIRD) OF TRUSTS § 90(c)(3)). "Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble*, 575 U.S. at 525.

13.    Plan fiduciaries have a continuing duty to monitor RKA fees to make sure that they are not excessive with respect to the services received. *See Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) ("[A] trustee is to 'incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship.'" *Id.* (quoting RESTATEMENT (THIRD) OF TRUSTS § 90(c)(3)); *Tibble*, 575 U.S. at 525.)

14.    Although "a fiduciary need not constantly solicit quotes for recordkeeping services to comply with its duty of prudence, . . . fiduciaries who fail to monitor the reasonableness of plan fees and fail to take action to mitigate excessive fees—such as by adjusting fee arrangements,

soliciting bids, consolidating recordkeepers, negotiating for rebates with existing recordkeepers, or other means—may violate their duty of prudence." *Hughes II*, 63 F.4th at 625-626.

15.     During the putative Class Period (October 17, 2017, through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duty of prudence they owed to the Plan by requiring the Plan to "pay[ ] excessive recordkeeping [and administrative (RKA)] fees," *Hughes*, 142 S. Ct. at 739-740, to Fidelity and to other non-Fidelity service providers and by failing to remove Fidelity and those other service providers.[1]

16.     Defendants, as fiduciaries of the Plan, also breached their fiduciary duty of prudence by "offer[ing] needlessly expensive investment options." *See Hughes*, 142 S. Ct. at 740.

17.     As a result of Defendants' actions, participants invested in subpar investment vehicles and paid additional unnecessary operating expenses and fees with no value to the participants and resulting in a loss of compounded returns.

18.     ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating total RKA fees and to selecting and retaining investments based on what is reasonable (not the *cheapest* or *average*) in the applicable market.

19.     There is no requirement to allege the actual inappropriate fiduciary actions taken because "an ERISA plaintiff alleging breach of fiduciary duty does not need to plead details to which he has no access, as long as the facts alleged tell a plausible story." *Allen v. GreatBanc Tr. Co.,* 835 F.3d 670, 678 (7th Cir. 2016).

20.     The unreasonable total RKA fees paid inferentially and plausibly establishes that an adequate investigation would have revealed to a reasonable fiduciary that the Plan total RKA

---

[1] Based on Form 5500s dating back to 2010, Fidelity has been the recordkeeper of the Plan for more than thirteen years.

services, given their level and quality, were improvident.  The facts alleged below show that a prudent fiduciary would have taken steps to reduce these Plan fees. *See Hughes II*, 63 F.4th at 628.

21.    The unreasonable selection and retention of Plan investments in the form of the American Fund Europacific Growth Fund R6 and active suite of Fidelity Freedom Funds inferentially tells the plausible story that Defendants breached their fiduciary duty of prudence under ERISA.

22.    There is no "obvious alternative explanation that suggests [that Defendants'] conduct falls within the range of reasonable judgments a fiduciary may make based on [their] experience and expertise." *Id.* at 635. Defendants' fiduciary decisions fall outside the range of reasonableness.  *Id.* at 630, 633.

23.    These breaches of fiduciary duty caused Plaintiff and Class Members tens of millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these unreasonable Plan fees and imprudent investment options.

24.    To remedy these fiduciary breaches, Plaintiff brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches. In addition, Plaintiff seeks to reform the Plan to comply with ERISA and to prevent further breaches of fiduciary duties and grant other equitable and remedial relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

25.    This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1132(e)(1), which provides for exclusive federal jurisdiction of fiduciary actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq.*

26.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

27.    Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

28.    In conformity with 29 U.S.C. §1132(h), Plaintiff served the initial iComplaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.i

## PARTIES

29.    Plaintiff, Edward Cure, is a resident of the State of Rhode Island and currently resides in East Greenwich, Rhode Island, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

30.    Plaintiff was a Compensation Manager and Supervisor at FM Global from April 2018 through April 2023. His employment took place at the FM Global headquarters in Johnston, Rhode Island.

31.    During the Class Period, Plaintiff invested in the following investments: BlackRock MSCI ACWI Index Fund, American Fund Europacific Growth Fund, Royce Pennsylvania Mutual Fund, BlackRock Extended Markets Fund, Fidelity Blue Chip Growth Fund, BlackRock Equity Index Fund, BlackRock U.S. Debt Index, and PIMCO Total Return Fund. Plaintiff is a former participant in the Plan who rolled out of the Plan after his employment ended.

32.    Plaintiff has Article III standing to bring this action on behalf of the Plan because he suffered actual injuries to his Plan account through paying excessive total RKA fees and through holding the American Fund Europacific Growth Fund R6 during his employment. Those injuries are fairly traceable to Defendants' unlawful conduct in maintaining Fidelity as its recordkeeper and

the American Fund Europacific Growth Fund R6, and that harm is likely to be redressed by a favorable judgment providing appropriate equitable relief to the Plaintiff and Class.

33.    Having established Article III standing, Plaintiff may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond his own injuries with regard to other investments he did not hold.

34.    The Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive total RKA fees and the underperformance of the American Fund Europacific Growth Fund R6 and the active suite of the Fidelity Freedom Funds) necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed.

35.    Having never managed a mega 401(k) Plan, Plaintiff, and all participants in the Plan, lacked actual knowledge of reasonable RKA fee levels available to the Plan, as well concerning alternative prudent investments in the same asset category.

36.    FM Global is an American mutual insurance company based in Johnston, Rhode Island, with offices worldwide, that specializes in loss prevention services primarily to large corporations throughout the world in the Highly Protected Risk property insurance market sector. FM Global has a Boston office at 1175 Boston-Providence Turnpike, Norwood, MA 02062, which has close to a thousand (1000) employees. In this Complaint, "FM Global" refers to the named Defendants and any other subsidiary, related, predecessor, and successor entities to which these allegations pertain.

37.    FM Global acted through its officers, including its Board of Directors, to perform Plan-related fiduciary functions in the course and scope of their business. FM Global and its Board appointed other Plan fiduciaries on the Plan Committee and accordingly had a concomitant

fiduciary duty to monitor and supervise those appointees. For these reasons, FM Global and its Board are fiduciaries of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

38.    The Plan is administered by the Plan Committee. As the Plan Administrator, the Plan Committee is a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). The Plan Committee has authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a), with all powers necessary to properly carry out such responsibilities.

39.    In 2021, the Plan had $1,837,627,752 in assets entrusted to the care of the Plan's fiduciaries. As a result, the Plan has the tremendous bargaining power to demand low-cost administrative and well-performing, low-cost investment funds. Defendants, however, did not regularly monitor Fidelity to ensure that Fidelity remained the prudent and objectively reasonable choice to provide total RKA services, nor did it effectively monitor the underperforming active suite of the Fidelity Freedom Funds.

40.    With 5,212 participants in 2021, the Plan had more participants than 99.69% of the defined contribution Plans in the United States that filed 5500 forms for the 2021 Plan year. Similarly, with $1,837,627,752  in assets in 2021, the Plan had more assets than 99.90% of the defined contribution Plans in the United States that filed 5500 forms for the 2021 Plan year.

**ERISA'S FIDUCIARY STANDARDS IN THE
DEFINED CONTRIBUTION INDUSTRY**

41.    Employers must: (1) establish a prudent process for selecting service providers and reviewing investments; (2) ensure that fees paid to service providers are reasonable in light of the level and quality of services provided; and (3) monitor service providers and investments once selected to make sure they continue to be prudent choices.

**Recordkeeping and Administrative ("RKA") Fees**

42.     Defined contribution plan fiduciaries of mega 401(k) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of mega retirement plans with a prudent and materially identical level and caliber of services. Fidelity is the largest of such recordkeepers.

43.     There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to mega defined contribution plans like the FM Global Plan.

44.     The cost of RKA services depends on the number of participants, not the amount of assets in the participant's account.

45.     Because the cost of recordkeeping services depends on the number of participants, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account.

46.     There are at least three types of RKA services provided by all recordkeepers and other service providers.

47.     The first type, "Bundled RKA," include, but are not limited to:

    a.     Recordkeeping;

    b.     Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

    c.     Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

    d.     Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

e.   Maintenance of an employer stock fund;

f.   Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g.   Plan consulting services including assistance in selecting the investments offered to participants;

h.   Accounting and audit services including the preparation of annual reports, e.g., Form 5500;

i.   Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan;

j.   Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules; and

k.   Trustee/custodian services.

48.   According to the August 14, 2023 FM Global Plan Participant Disclosure Notice under ERISA Section 404(a)(5), "Plan administrative fees may include recordkeeping, legal, accounting, trustee, and other administrative fees and expenses associated with maintaining the Plan. Some plans may deduct these fees and expenses from individual accounts in the Plan." *Id.* at 4-5.

49.   This is the exact same boilerplate language that Fidelity uses for every mega plan it recordkeeps, even though Plan participants are required under ERISA Section 404(a)(5) regulations to be given a better understanding of what Plan services they receive for administrative fees paid to Fidelity and other non-Fidelity service providers.

50.   Without explanation, the 2023 Participant Fee Disclosure merely states that Plan participants are paying $49.00 per year for "recordkeeping" and that "the Plan's administrative services may also be paid for through offsets and/or payments associated with one or more of the Plan's investment options." *Id.* at 5. This later type of fee is referred to as indirect compensation or revenue sharing.

51. There is no explanation in any Plan publicly-filed documents what indirect compensation or revenue sharing amounts are being paid through these offsets and payments associated with the Plan's investment options.

52. Both indirect and direct compensation are included in Total RKA fees for both the Plan and comparator plans in the charts below because retirement plan participants pay those fees out of their individual accounts to both Fidelity and to the other Plan service providers.

53. Nothing exists in any Plan documents provided to Plan participants to suggest that there is anything exceptional, unusual, or customized, about the RKA services provided to FM Global Plan participants.

54. RKA services are necessary for every defined contribution plan. RKA services for a retirement plan, like the Plan, are essentially fixed and largely automated. It is a system where costs are driven purely by the number of inputs and the number of transactions. In essence, it is a computer-based bookkeeping system.

55. The Plan provided participants all the commoditized RKA services provided to all other mega 401(k) plan participant. The quality or type of RKA services provided by competitor recordkeepers are comparable to that provided by Fidelity and other non-Fidelity service providers. Any differences in RKA services are immaterial to the price quoted by recordkeepers other service providers for such services.

56. RKA services are largely standardized because the RKA providers must provide these services at scale to a large number of plans and must comply with regulatory requirements. They cannot offer customized sets of services to each individual plan.

57. The bulk of the fee paid for RKA services pays for core services that do not vary from plan to plan.

58.     Industry experts have maintained for years that for mega retirement plans like the FM Global Plan, prudent fiduciaries treat RKA services as a commodity with little variation in price. "Custody and recordkeeping are 'commodity' services. Like any commodity, given equal quality, the key benchmark for these services is price. The cheaper you can find competent custody and recordkeeping services, the better for participants." Eric Droblyen, *Evaluating 401(k) Providers: Separating Commodity from Value-Added Services*, https://www.employeefiduciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-services (Feb. 10, 2015.)

59.     Because RKA services are commoditized, recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for mega plans like the Plan.

60.     RKA services are essentially fungible and the market for them is highly competitive. This highly competitive RKA market is filled with equally capable recordkeepers and other non-Fidelity service providers, who can provide comparable RKA services for less if only asked to provide bids to mega plans like the FM Global Plan.

61.     Given the mega size of the FM Global Plan, the same price paid by the FM Global Plan for RKA services to Fidelity and other non-Fidelity service providers over the Class Period, and the trend of price compression for RKA services over the last six years, it is possible to infer that Defendants did not engage in any competitive solicitation of RKA service bids, or only ineffective ones, breaching their fiduciary duties of prudence.

62.     The second type of essential RKA services, hereafter referred to as "A La Carte services," provided by all recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants. These "A La Carte RKA" services typically include the following:

     a.     Loan processing;

     b.     Brokerage services/account maintenance;

     c.     Distribution services; and

     d.     Processing of Qualified Domestic Relations Orders (QDROs).

63. According to the August 14, 2023 FM Global Plan Participant Disclosure Notice under ERISA Section 404(a)(5), the Plan provided all such standard A La Carte usage services as other similar mega 401(k) plans do. *Id.* at 5.

64. The third type of RKA fees are Ad Hoc fees which are transaction fees and other administrative fees, and include such things as ESOP fees, fees for service, and terminated maintenance fees.

65. According to the August 14, 2023 FM Global Plan Participant Disclosure Notice under ERISA Section 404(a)(5), the Plan paid all the standard Ad Hoc RKA fees set out above and just like other comparable mega plans do.

66. The sum of the Bundled RKA fees, A La Carte RKA fees, and Ad Hoc RKA fees equals the Total RKA fees.

67. Total RKA fee numbers represent the best methodology for determining apples-to-apples comparisons of  plans as far as what is being charged to plan participants for Total RKA. It is irrelevant whether Fidelity or other Plan service providers receive those fees from Plan participants.

68. The methodology utilized in this Complaint for calculating the Total RKA for both the FM Global Plan and for the comparison plans discussed below contains the following seven steps:

     a.   taking the direct compensation paid to each plan's recordkeeper directly from Schedule C of Form 5500;

b.  reviewing the investments held by the plan listed in the supplemental schedule to Form 5500, Schedule H, Part IV, Line 4(i) – Schedule of Assets;

c.  reviewing Schedule C, Part I, Line 3 for revenue sharing earned by investments in the plan;

d.  Cross-referencing publicly available revenue sharing rates for investment options by recordkeeping platform and custody and trading partners to determine whether each investment option contains any revenue sharing and, if so, what the appropriate revenue sharing rate is for each investment option in the plan;

e.  utilizing the year-end assets for each investment option from Form 5500, Schedule H, Part IV, Line 4(i) and multiply it by the appropriate revenue sharing rate to determine the amount of indirect compensation earned by the recordkeeper;

f.  reviewing the notes of the Audited Financial Statement attachment to Form 5500. In many cases, the notes to the Audited Financial Statement provide additional information that can determine each plan's pricing structure and whether any revenue sharing was allocated back to the plan and/or Plan Participants and, if so, how much; and

g.  reviewing the results for reasonableness and make revisions as appropriate based on Plaintiff's non-testifying experts experience in evaluating plans at the different recordkeepers.

69.    Because the Total RKA offerings are fungible among all recordkeepers and other non- service providers who provide services to mega plans, like the FM Global plan, it is the standard and prevailing practice for retirement plan consultants and advisors to request quotes by asking what the "revenue requirement" is on a per participant basis for providing the Total RKA services.

70.     This approach is validated by the structure of the request for proposals (RFPs) sent out by retirement plan consultants and advisors and the responses provided by the recordkeepers and other service providers and then the summary of the evaluations created by the retirement plan consultants and advisors.

71.     Fidelity, the largest 401k recordkeeper in the country, has in fact conceded in another recent case that the total RKA services that it provides to mega plans are commodified, including the plan services provided to its own employees.

72.     As part of stipulated facts in a previous case, Fidelity stated: "The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year, and the value of the recordkeeping services that Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity it could have obtained recordkeeping services for these amounts during these periods. *The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).*" See *Moitoso v. FMR LLC, et al.*, 1:18-CV-12122-WGY, Stipulation of Facts, Dkt. 128-67, at 4-5 (D. Mass. Sep. 6, 2019) (emphasis added).

73.     In other words, because the FM Global Plan is at least a $1-billion dollar Plan, Fidelity has conceded in the past that the FM Global Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period.

74.    By the start of, and during the entire Class Period, the level of fees that recordkeepers and other service providers have been willing to accept for providing Total RKA has stabilized, and has not materially changed for mega plans, including the FM Global Plan.

75.    Reasonable Total RKA fees paid throughout the Class Period in 2018 are therefore representative of the reasonable fees during the entire Class Period. *See The Economics of Providing 401(k) Plans: Services, Fees, and Expenses, 2020*, ICI Research Perspective, at 4 (June 2021).

**Investments**

76.    Plan fiduciaries of a defined contribution plan have a continuing and regular duty of prudence to monitor all investment options they make available to Plan participants on a regular basis and remove imprudent ones.

77.    The primary purpose in selecting plan investments is to give all participants the opportunity to create an appropriate asset allocation under modern portfolio theory by providing diversified investment alternatives.

78.    When choosing an active investment option, the analysis is focused on determining whether the portfolio manager is likely to outperform an appropriate benchmark.

79.    Accordingly, the primary focus when choosing an active investment option to make available to plan participants is the skill of the portfolio manager.

80.    When considering the performance of investments in Plan, Plan fiduciaries must consider both quantitative and qualitative performance metrics.

81.    Quantitative metrics should include not just Morningstar peer rankings over various periods of time, but also other commonly-utilized performance metrics such as Sharpe Ratios, Information Ratios, Batting Averages, and Jensen's Alpha.

82.    Qualitative metrics include tenure of fund manager, whether the fund manager has been recently replaced and by whom, and whether the fund has exhibited changes in capitalization

or style drift (growth vs. value, international vs. domestic, etc.).

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES
## SELECTING & MONITORING RETIREMENT PLAN SERVICE PROVIDERS

83.     Prudent plan fiduciaries ensure they are paying only reasonable fees for RKA by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, and soliciting competitive bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan. *See, e.g.,* U.S. DEPARTMENT OF LABOR, *Understanding Retirement Plan Fees and Expenses*, at 6, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publicati ons/understanding-retirement-plan-fees-and-expenses.pdf (last visited Oct. 10, 2022) ("Give all [retirement plan service providers] complete and identical information about your plan and the features you want so that you can make a meaningful comparison. This information should include the number of plan participants and the amount of plan assets as of a specified date.")

84.     Prudent plan fiduciaries can easily receive a quote from other RKA providers to determine if the current level of total RKA fees is reasonable in light of the level and quality of RKA fees. It is not a cumbersome or expensive process.

85.     It is the standard of care prevailing among industry experts to solicit competitive bids every three to five years. *See* CAPTRUST, *Understanding and Evaluating Retirement Plan Fees | Part One:      A      Holistic      Approach*, https://www.captrust.com/understanding-and-evaluating-retirement-plan-fees-part-one-a-holistic-a pproach/ (stating "best practice is . . . a more formal recordkeeper search and selection process conducted approximately every three to five years. Recordkeeping and administrative fees should be evaluated and compared to plans of similar size and type that are receiving analogous services. While each plan is unique—making an apples-to-apples comparison imperfect—evaluating fees against

similarly situated and sized plans provides a good reference point in helping to determine if plan fees are reasonable.")

86.     Having received bids, prudent plan fiduciaries can negotiate with their current RKA providers for a lower fee or move to a new RKA providers to provide a materially identical level and qualities of services for a more competitive reasonable fee if necessary.

87.     An internal benchmarking survey from CapTrust, Fiduciary Decisions, or similar benchmarking service providers, is inadequate to determine a reasonable total RKA fee. Such surveys skew to higher "average prices," that favor inflated total RKA fees. To receive a "reasonable" total RKA fee in the prevailing market, prudent plan fiduciaries engage in solicitations of competitive bids on a periodic basis.

88.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's RKA costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

89.     First, a hypothetical prudent fiduciary tracks RKA provider's expenses by demanding documents that summarize and contextualize their compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

90.     Second, to make an informed evaluation as to whether a RKA provider is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's RKA provider.

91.     Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the RKA rates that are available. By soliciting bids from other RKA providers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of RKA services.

92. Accordingly, the best way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of RKA services is to obtain competitive bids from other providers in the market. *Hughes II*, 63 F.4th at 625-626 (although "a fiduciary *need not constantly solicit quotes* for recordkeeping services to comply with its duty of prudence, . . . fiduciaries who fail to monitor the reasonableness of plan fees and *fail to take action to mitigate excessive fees—such as by* adjusting fee arrangements, *soliciting bids*, consolidating recordkeepers, negotiating for rebates with existing recordkeepers, or other means—may violate their duty of prudence.") (emphasis added).

## THE PLAN PAID UNREASONABLE TOTAL RKA FEES

93. A plan fiduciary must continuously monitor its Total RKA fees by regularly conducting an independent evaluation of those fee to ensure they are reasonable and remove RKA providers if those fees are unreasonable. *See Hughes*, 142 S. Ct. at 742.

94. During the Class Period, Defendants egregiously failed to regularly monitor the Plan's Total RKA fees paid to Fidelity and other non-Fidelity service providers.

95. During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from RKA service providers, including but not limited to Fidelity and other non-Fidelity service providers, in order to avoid paying unreasonable Total RKA fees.

96. During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was ineffective given the objectively unreasonable Total RKA fees it paid to Fidelity and other non-Fidelity service providers, and in light of the level and quality of Total RKA services it received that were materially similar to services available through other RKA providers and provided to other mega plans.

97. As set forth in the table below, from the years 2017 through 2022, based upon information provided in 5500 Forms filed with the Department of Labor (DOL) and by the Plan

fiduciaries to Plan participants in the Participant Required Disclosures under Section 404(a)(5), the

Plan paid an effective average annual total RKA fee of $120 per participant.

### Total Recordkeeping and Administration (Total RKA) Fees

| | 2017 | 2018 | 2019 | 2020 | 2021 | Average |
|---|---|---|---|---|---|---|
| Participants | 4,844 | 4,947 | 5,043 | 5,153 | 5,212 | 5,040 |
| Est. Total RKA Fees | $650,541 | $448,473 | $642,262 | $700,483 | $570,589 | $602,470 |
| Est. Total RKA Per Participant | $134 | $91 | $127 | $136 | $109 | $120 |
| Reliable Est. of Reasonable Total RKA Fees | $222,824 | $227,562 | $231,978 | $237,038 | $239,752 | $231,831 |
| Reliable Est. of Reasonable Total RKA Fees Per PP | $46 | $46 | $46 | $46 | $46 | $46 |
| Est. Total RKA Losses | $125,386 | $220,911 | $410,284 | $463,445 | $330,837 | $310,173 |
| Est. Total RKA Losses Per PP | $26 | $45 | $81 | $90 | $63 | $62 |

98.    The table below illustrates the annual Total RKA fees paid by other similarly-sized

comparable plans in 2018, receiving a materially similar level and quality of Total RKA services,

compared to the 2018 Total RKA fees paid by the Plan (as identified in the table above).

### Comparable Plans' Total RKA Fees Based on Publicly Available Information - Form 5500
(Price calculations are based on 2018 Form 5500 information)

| Plan | Participants | Total RKA Fee | Total RKA Fee /pp | Recordkeeper |
|---|---|---|---|---|
| Associated Materials, LLC 401(K) Retirement Plan | 3,639 | $179,475 | $49 | ADP |
| The Boston Consulting Group, Inc. Employees' Profit Sharing Retirement Fund | 4,369 | $185,805 | $43 | Vanguard |
| **FM Global Plan Average Fee** | **4,947** | **$448,473** | **$91** | **Fidelity** |
| Summit Materials 401(K) Retirement Plan | 5,957 | $268,457 | $45 | Great-West |
| Smithfield Foods, Inc. Salaried 401(K) Plan | 6,149 | $278,907 | $45 | Great-West |
| Flowserve Corporation Retirement Savings Plan | 6,395 | $285,814 | $45 | T. Rowe Price |

99.    To determine the Total RKA fees that other comparable plans are paying as evidence

of the reasonable fee that a prudent plan fiduciary would have been able to obtain, Plaintiff

considered both the direct and indirect compensation collected and retained by recordkeepers, as

disclosed on publicly available Form 5500s, and then adding all the direct compensation paid for RKA services with the indirect compensation *both* allocable to the provision of RKA services *and retained* by the RKA service provider.

100. To ensure meaningful, apples-to-apples comparisons, Plaintiff used the same methodology to compare the fees of the Plan with the fees of other similarly situated and comparable plans.

101. **Associated Materials, LLC 401(K) Retirement Plan** ("Associated"): The reliable estimate of $49/pp is comprised of $49/pp in direct compensation paid to ADP from Form 5500 Schedule C and a calculation of $0/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times the revenue sharing rates and pricing credits provided by recordkeepers, which are publicly available. In other words, none of the investment options in the Associated Plan appear to contain revenue sharing.

102. The Associated Plan is a meaningful benchmark because in 2018 it had over 3,639 participants, slightly less than the 4,947 participants in the Plan. The costs to a recordkeeper for providing RKA services to a plan with more than around 2,500 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Associated Plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the Associated Plan and the fees paid by the Plan.

103. Therefore, fact that the Plan has slightly more participants than the Associated Plan does not make it a meaningless comparable plan because, all else being equal, if the Associated Plan can obtain a fee of $49/pp with 3,639 participants, then the Plan, with 4,947 participants, should be able to obtain a fee of around $49/pp, *or lower*. This fact, among other reasons, makes the Associated Plan a meaningful benchmark.

104.    **The Boston Consulting Group, Inc. Employees' Profit Sharing Retirement Fund** ("Boston Consulting"):  The reliable estimate of $43/pp is comprised of $43/pp in direct compensation paid to Vanguard from Form 5500 Schedule C and a calculation of $0/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times the revenue sharing rates and pricing credits provided by recordkeepers, which are publicly available. In other words, none of the investment options in the Boston Consulting Plan appear to contain revenue sharing.

105.    The Boston Consulting Plan is a meaningful benchmark because in 2018 it had 4,369 participants, virtually identical to the 4,947 participants in the Plan. The costs to a recordkeeper for providing RKA services to a plan with more than around 2,500 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Boston Consulting Plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the Boston Consulting Plan and the fees paid by the Plan.

106.    Therefore, all else being equal, if the Boston Consulting plan can obtain a fee of $43/pp with 4,369 participants, then the Plan, with 4,947 participants, should be able to obtain a fee of around $43/pp. The fact that the Boston Consulting plan had virtually the identical number of participants in 2018 as the Plan, among other reasons, makes the Boston Consulting plan a meaningful benchmark.

107.    **Summit Materials 401(k) Retirement Plan** ("Summit"):  The reliable estimate of $45/pp is comprised of $37/pp in direct compensation paid to Great-West from Form 5500 Schedule C and a calculation of $8/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV,

Line 4i times the revenue sharing rates and pricing credits provided by recordkeepers, which are publicly available.

108.    The Summit Plan is a meaningful benchmark because in 2018 it had 5,957 participants, which is slightly more than the 4,947 participants in the Plan and provides a data point that enables the calculation of a trendline that is used to generate a reliable estimate of the reasonable market rate for RKA services across a range of participants and which declines as a plan gains more participants.

109.    The fact that the Plan has fewer participants than the Summit Plan does not make the Summit Plan a meaningless comparable plan. Plaintiffs do not contend the Plan should have necessarily been able to obtain a fee as low as the Summit Plan.

110.    Rather, the Summit Plan Total RKA fee provides a data point that enables the production of a trendline that provides reliable evidence of the reasonable fee rate for RKA services across a range of between around 2,500 and 6,500 participants. The massive disparity between the reliable estimate of the reasonable market Total RKA fee rate for RKA services for the Plan (based on having 4,947 participants) of around $46/pp and the Plan's actual Total RKA fee rate of around $91/pp leads to a reasonable inference that the Plan's process was not prudent.

111.    **Smithfield Foods, Inc. Salaried 401(k) Plan** ("Smithfield"): The reliable estimate of $45/pp is comprised of $45/pp in direct compensation paid to Great-West from Form 5500 Schedule C and a calculation of $0/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times the revenue sharing rates and pricing credits provided by recordkeepers, which are publicly available. In other words, none of the investment options in the Smithfield plan appear to contain revenue sharing.

112.    The Smithfield Plan is a meaningful benchmark because in 2018 it had 6,149 participants, which is slightly more than the 4,947 participants in the Plan and provides a data point that enables the calculation of a trendline that is used to generate a reliable estimate of the reasonable market rate for RKA services across a range of participants and which declines as a plan gains more participants.

113.    The fact that the Plan has fewer participants than the Smithfield Plan does not make the Smithfield Plan a meaningless comparable plan. Plaintiff does not contend the Plan should have necessarily been able to obtain a fee as low as the Smithfield Plan.

114.    Rather, as noted above, the Smithfield plan Total RKA fee provides a data point that enables the production of a trendline that provides reliable evidence of the reasonable fee rate for RKA services across a range of between around 2,500 and 6,500 participants. The massive disparity between the reliable estimate of the reasonable market Total RKA fee rate for RKA services for the Plan (based on having 4,947 participants) of around \$46/pp and the Plan's actual Total RKA fee rate of around \$91/pp leads to a reasonable inference that the Plan's process was not prudent.

115.    **Flowserve Corporation Retirement Savings Plan** ("Flowserve"):  The reliable estimate of \$45/pp is comprised of \$11/pp in direct compensation paid to T. Rowe Price from Form 5500 Schedule C and a calculation of \$34/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times the revenue sharing rates and pricing credits provided by recordkeepers, which are publicly available.

116.    The Flowserve Plan is a meaningful benchmark because in 2018 it had 6,395 participants, which is slightly more than the 4,947 participants in the Plan and provides a data point that enables the calculation of a trendline that is used to generate a reliable estimate of the

reasonable market rate for RKA services across a range of participants and which declines as a plan gains more participants.

117.    The fact that the Plan has fewer participants than the Flowserve Plan does not make the Flowserve plan a meaningless comparable plan. Plaintiffs do not contend the Plan should have necessarily been able to obtain a fee as low as the Flowserve plan. Rather, as noted above, the Flowserve Plan Total RKA fee provides a data point that enables the production of a trendline that provides reliable evidence of the reasonable fee rate for RKA services across a range of between around 2,500 and 6,500 participants. The massive disparity between the reliable estimate of the reasonable market Total RKA fee rate for RKA services for the Plan (based on having 4,947 participants) of around $46/pp and the Plan's actual Total RKA fee rate of around $91/pp leads to a reasonable inference that the Plan's process was not prudent.

118.    Rather, as noted above, the Flowserve Plan Total RKA fee provides a data point that enables the production of a trendline that provides reliable evidence of the reasonable fee rate for RKA services across a range of between around 2,500 and 6,500 participants. The massive disparity between the reliable estimate of the reasonable market Total RKA fee rate for RKA services for the Plan (based on having 4,947 participants) of around $46/pp and the Plan's actual Total RKA fee rate of around $91/pp leads to a reasonable inference that the Plan's process was not prudent.

119.    Viewing all the data points provided by the comparable plans set forth above holistically and in the full context of how the retirement plan industry operates supports a reasonable inference that the Plan paid unreasonable and excessive fees for total RKA services.

120.    The market for RKA services is not transparent. Recordkeepers do not provide transparency related to the fees they charge all their clients, nor do they provide transparency related to the bids they provided throughout the Class Period for other plans with a similar number of participants as the Plan.

121.    Recordkeepers are able to negotiate at arm's length with plan fiduciaries and will happily accept higher fees from plan fiduciaries who are unaware of the reasonable market rate through, for example, failing to solicit competitive bids, among other reasons.

122.    Due to the lack of transparency, the primary and most significant driver of the disparity between the actual RKA fees paid by plans with similar numbers of participants greater than around 2,500 is the actual practices of the plans' fiduciaries.

123.    Therefore, the most plausible explanation of the disparity of between $41/pp and $48/pp from the comparable plans and the Plan (an excess of between 84% and 113%) is that the Plan's fiduciaries engaged in imprudent conduct.

124.    The following charts summarizes the Plan fees for the comparable plans:

|  | Associated | Boston Consulting | Summit | Smithfield | Flowserve |
|---|---|---|---|---|---|
|  | ADP | Vanguard | Great-West | Great-West | T. Rowe Price |
| Participants (#) | 3,639 | 4,369 | 5,957 | 6,149 | 6,395 |
| Direct Compensation (Schedule C) ($) | $179,475 | $185,805 | $219,091 | $278,907 | $69,358 |
| Indirect Compensation (Rev Share) ($) | $0 | $0 | $49,366 | $0 | $216,456 |
| Administrative Credit to Plan ($) | $0 | $0 | $0 | $0 | $0 |
| Annual RK&A Fees ($) | $179,475 | $185,805 | $268,457 | $278,907 | $285,814 |
| Annual RK&A Fees ($/pp) | $49 | $43 | $45 | $45 | $45 |

125.    These comparator plans "provid[e] a sound basis for comparison—a meaningful benchmark." *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 278 (8th Cir. 2022);

126.    In 2018 (and throughout the Class Period for that matter), had the Plan fiduciaries simply followed the standard of care for prudent plan fiduciaries they would have received *initial* bids to provide RKA services from recordkeepers such as Transamerica, Fidelity, Schwab, Voya, Wells Fargo, Empower, Vanguard, T. Rowe Price, and John Hancock, among others, that would have averaged around the reliable estimate of $45 and ranged both above and below the reliable estimate of $45.

127.    Had the Plan fiduciaries followed the standard of care for prudent fiduciaries they would have been able to negotiate with the bidders through a competitive process and ultimately

ended up with a reasonable fee rate much lower than the *initial* bid. Moreover, through following that standard of care, prudent plan fiduciaries ensure that the bids include all the RKA required by the Plan.

128. The disparity between the fee rates of the comparable plans based on the amount of participants in each of the plans and the reliable estimate based on the trend line created by the comparable plans fee rates is $4 per participant or less, and is most plausibly explained by minor variations in negotiation tactics and circumstances among the fiduciaries of the comparable plans and the various recordkeepers..

129. This lack of disparity is in stark contrast to the disparity of $46 per participant paid by the Plan compared to the reasonable fee rate paid for a plan with 4,947 participants of around $45.

130. The amount of assets in a plan has little to no impact on the costs to the recordkeeper, so any differences in the amount of assets in the comparable plans compared to the Plan has no impact on whether the comparable plans make meaningful benchmarks.

131. The comparator plans serviced by other recordkeepers and who charged less received materially the same level and quality of Total RKA services given that these services are fungible and commodified for mega Plan like the FM Global Plan. Indeed, each of these Plans note in their fee disclosures and other Plan documents that they received RKA services materially similar to the FM Global Plan in the form of recordkeeping, trustee, accounting, and other administrative services.

132. Although some of the comparators utilize different service or compensation codes for the services received on the 5500 Form, Total RKA fees are fungible and commoditized and any differences between the plans in these codes are immaterial from a pricing perspective.

133.    The graph below illustrates the annual Total RKA fees paid by other comparable plans of similar sizes, receiving a materially similar level and quality of RKA services in 2018, compared to the 2018 Total RKA fees paid by the FM Global Plan, with the white data points representing total RKA fees paid by comparable plans.



134.    The trend line (dashed white in the graph above) generated from these data points represenst a reasonable estimate of the fee rate that several RKA service providers serving the mega market would be willing to accept in a competitive environment to provide total RKA services to the FM Global Plan.

135.    From the years 2017 to 2021, the table above illustrates that the Plan paid an effective average annual Total RKA fee of $120 per participant.

136.    A reasonable Total RKA fee for the FM Global Plan based on the services provided by existing RKA service providers and the Plan's features, based on graphs and charts above, would have been $46 per participant.

137.    The Total RKA fees paid by the Plan to Fidelity and other non-Fidelity service providers during the Class Period were excessive relative to the RKA services rendered. More specifically, a disparity of $62 per participant (over 139% premium) for materially similar Total RKA services existed during the Class Period.

138.    From the years 2017 through 2021, and based upon information derived from the Plan 5500 Forms and 404(a)(5) participant fee disclosure documents provided to participants in similarly sized plans, had Defendants been acting prudently, the Plan actually would have paid significantly less than an average of approximately $602,470 per year in Total RKA fees, which equated to an effective average of approximately $120 per participant per year.

139.    From the years 2017 through 2021, and based upon information derived from the Plan 5500 Forms and the 404(a)(5) participant fee disclosure documents provided to participants in similarly sized plans, as compared to other Plans of similar sizes receiving a materially similar level and quality of Total RKA services, had Defendants been acting prudently, the Plan actually would have paid on average a reasonable effective annual market rate for Total RKA of approximately $231,831 per year, which equates to approximately $46 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan fiduciary would not agree to pay *an 139% premium* for what they could otherwise pay for the materially similar level and quality of Total RKA services.

140.    From the years 2017 through 2021, and based upon information derived from the Plan 5500 Forms and 404(a)(5) participant fee disclosures, the Plan additionally cost its participants on average approximately $310,173 per year in unreasonable and excessive Total RKA fees, which equates to, on average, approximately $62 per participant per year.

141.    From the years 2017 to 2021, and because Defendants did not act with prudence, and as compared to other plans of similar sizes and with a materially identical level and quality of

services, the Plan actually cost its participants a total minimum amount of approximately $1,550,863 in unreasonable and excessive Total RK&A fees.

142.    From the years 2017 to 2021, based upon information derived from the Plan 5500 Forms and 404(a)(5) participant fee disclosures, because Defendants did not act prudently, and as compared to other plans of similar sizes and with a materially identical level and quality of services, the Plan caused Plan participants to suffer losses (when accounting for compounding percentages/lost market investment opportunity) a total cumulative amount in excess of $2,025,172 in Total RKA fees.

143.    Defendants could have received Total RKA services during the Class Period of the same level and quality from Fidelity and other non-Fidelity service providers that provide RKA services to mega plans, like the FM Global plan, because the Plan 5500 Forms and Plan fee disclosures establish that the Plan received no services that were materially different than the services received by all the comparable plans in the chart above.

144.    Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, no reasonable tradeoffs existed here because recordkeepers for mega plans, like the FM Global Plan, are providing the materially same level and quality of commoditized services.

145.    Defendants failed to take advantage of the Plan's substantial size to timely negotiate lower fees from Fidelity and other non-Fidelity service providers.

146.    Defendants could have obtained the materially same Total RKA services for less from other RKA providers or from Fidelity and other existing non-Fidelity service providers had the Plan only leveraged its substantial size on the RKA provider marketplace.

147.    Defendants did not conduct effective or competitive bidding for Total RKA services, and failed to use the Plan's substantial size to negotiate rebates from Fidelity and the non-Fidelity service providers.

148.    Plaintiff and Class Members paid these excessive Total RKA fees in the form of direct and indirect compensation to the Plan and suffered injuries to their Plan accounts as a result.

149.    During the entirety of the Class Period, and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the Total RKA fees it paid to Fidelity and the non-Fidelity service providers, it would have realized that the Plan was compensating Fidelity and the non-Fidelity service providers unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiff and other Plan participants.

150.    Defendants should have removed Fidelity and the non-Fidelity service providers as Plan RKA providers during the Class Period. Instead, it kept Fidelity and the non-Fidelity service providers at these inflated Total RKA fee prices for over thirteen years.

151.    During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher Total RKA fees than they should have been and/or by failing to take effective remedial actions including removing Fidelity and the non-Fidelity service providers as the Plan RKA providers, Defendants breached their fiduciary duty of prudence to Plaintiff and to other Plan participants, causing millions of dollars of harm to Plaintiff and Class Member's retirement accounts.

### THE PLAN'S INVESTMENTS IN THE AMERICAN FUND EUROPACIFIC GROWTH FUND R6 AND FIDELITY FREEDOM FUNDS

152.    According to the Plan's Form 5500s, the Plan has offered some version of the American Fund Europacific Growth Fund and a suite of fourteen (14) target date funds, the active suite of the Fidelity Freedom Fund Class K, from at least 2010 to 2023.

153. The American Fund Europacific Growth Fund R6 is considered part of the Foreign Large Growth Morningstar Category for comparison purposes. It is actively managed.

154. A target date fund is an investment vehicle that offers an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the assumed target retirement year approaches.

155. All target date funds are inherently actively managed because managers make changes to the allocations to stocks, bonds, and cash over time. These allocation shifts are referred to as a fund's "glide path." The underlying mutual funds that target date fund managers choose to represent each asset class can be actively or passively managed.

156. Defendant Plan Committee was responsible for crafting the Plan lineup and could have chosen any other foreign large growth fund or target date families.

157. Defendant Plan Committee failed to act prudently and breached their fiduciary duty by selecting and retaining the American Fund Europacific Growth Fund and the active suite of the Fidelity Freedoms Funds Class K from at least 2010 until 2023.

158. During the Class Period, Defendants failed to act prudently by engaging in an objectively reasonable investigation process and imprudently retained and failed to replace the under-performing and costly American EuroPacific Growth Fund R6 (RERGX) in October 2017 (at the beginning of the Class Period) with a better-performing and lower-cost foreign large growth fund.

159. As far as the Fidelity Freedom Suite, the active suite of the Fidelity Freedom Fund underwent a strategy overhaul in 2013 and 2014, and its managers have had the discretion to deviate from the glide path allocations by 10 percentage points in either direction.

160.    In a departure from the accepted wisdom  that target date funds should maintain pre-set allocations, Fidelity encouraged its portfolio managers to attempt to time market shifts to locate underpriced securities.

161.    This strategy heaped further unnecessary risk on investors, such as Plan participants, in the active suite.

162.    A March 2018 Reuters special report on the Fidelity Freedom Funds details how many investors lost confidence in the active suite "because of their history of underperformance, frequent strategy changes and rising risk."

163.    That same report quotes a member of Longfellow Advisors, who told Reuters that, after the 2014 changes, "it was not clear to us that [the managers of the active suite] knew what they were doing."

164.    *Hughes v. Northwestern Univ.* holds that every investment on an ERISA plan's menu must be prudent, and "participants' ultimate choice over their investments [does not] excuse allegedly imprudent decisions by [fiduciaries]." 142 S. Ct. at 742.

165.    For each of challenged imprudent investments discussed below, Plaintiff has provided a prudent alternative investment option that satisfied the same role in the same asset category as the challenged fund with respect to the plan fiduciaries' duty to provide a diversified lineup of investment options.

166.    Each prudent alternative investment option is in the same Morningstar Investment category as the challenged option it should have replaced throughout the Class Period.

167.    Each prudent investment option provided equivalent or superior risk adjusted returns compared to the challenged option at a lower net investment cost.

168.    During the Class Period, Defendants did not engage in an objectively reasonable process when selecting a target date fund suite for the Plan.

169.    During the Class Period and had Defendants been acting prudently, Defendants would have selected a target date fund suite with better performance than those funds actually selected by Defendants from 2010-2023.

170.    During the Class Period, Plaintiff had no knowledge of Defendants' process for selecting investments and for regularly monitoring them to ensure they remained prudent.

171.    During the Class Period, Plaintiff had no knowledge of how the performance of the challenged funds compared to readily-available prudent alternative investments.

172.    During the Class Period, Plaintiff did not know about the availability of better-performing (and other essentially identical) investment options that Defendants failed to reasonably offer at the beginning of the Class Period in October 2017 because Defendants provided no comparative information to allow Plaintiff to evaluate and compare Defendants' investment options.

173.    During the Class Period and because Defendants imprudently chose investment options that were not materially similar to the better performing comparator funds identified below at the beginning of the Class Period, Defendants caused unreasonable and unnecessary losses to Plaintiff and Plan's participants in the tens of millions of dollars.

174.    During the Class Period, Defendants failed to act prudently by engaging in an objectively reasonable investigation process and imprudently retained and failed to replace the underperforming, active-suite of the Fidelity Freedom Funds.

175.    For instance, Defendants failed to investigate and did not prudently replace the American EuroPacific Growth Fund R6 (RERGX) with the Vanguard International Growth Fund as an alternative prudent investment, which is a materially similarly and better performing alternative prudent investment, in the same asset category from October 2017 forward.

176.    Because Defendants did not prudently replace the at the beginning of the Class

Period with an alternative prudent investment in the same asset category in October 2017, Defendants caused objectively unreasonable and unnecessary losses to Plaintiff and the Plan's participants in the amount of approximately $7,935,152 through March 31, 2023, as detailed in the following chart:

| **Replacement Fund Name** | **Fund Ticker** | **Morningstar Category** | **Damages as 3/31/23** |
|---|---|---|---|
| Vanguard International Growth | VWILX | Foreign Large Growth | $7,935,152 |

177.    Similarly, Defendants failed to investigate and did not prudently replace the active suite of the Fidelity Freedom Fund with the American Funds Target Date Retirement suite as an alternative prudent investment, which is a materially similar and better performing alternative prudent investment, in the same asset category from October 2017 forward.

178.    Defendants caused objectively unreasonable losses to Plaintiff and the Plan's participants in the amount of approximately $13,867,554.29 from October 31, 2017 through August 31, 2023, when comparing the Fidelity Freedom Funds TDF Active Suite to the replacement funds in the American Funds TDF Active Suite:

| **Fund Replaced by American Fund** | **Ticker** | **Morningstar Category** | **Damages (12/31/22)** |
|---|---|---|---|
| Fidelity Freedom 2005 Fund - Class K | FSNJX | Target-Date 2000-2010 | $    146,910.33 |
| Fidelity Freedom 2010 Fund - Class K | FSNKX | Target-Date 2000-2010 | $ 1,411,558.82 |
| Fidelity Freedom 2015 Fund - Class K | FSNLX | Target-Date 2015 | $    255,267.23 |
| Fidelity Freedom 2020 Fund - Class K | FSNOX | Target-Date 2020 | $ 1,767,396.08 |
| Fidelity Freedom 2025 Fund - Class K | FSNPX | Target-Date 2025 | $ 1,350,921.33 |
| Fidelity Freedom 2030 Fund - Class K | FSNQX | Target-Date 2030 | $ 3,135,385.21 |
| Fidelity Freedom 2035 Fund - Class K | FSNUX | Target-Date 2035 | $    912,906.97 |
| Fidelity Freedom 2040 Fund - Class K | FSNVX | Target-Date 2040 | $ 1,959,541.78 |
| Fidelity Freedom 2045 Fund - Class K | FSNZX | Target-Date 2045 | $    671,104.89 |
| Fidelity Freedom 2050 Fund - Class K | FNSBX | Target-Date 2050 | $    774,746.17 |
| Fidelity Freedom 2055 Fund - Class K | FNSDX | Target-Date 2055 | $    493,386.84 |
| Fidelity Freedom 2060 Fund - Class K | FNSFX | Target-Date 2060 | $     67,211.49 |
| Fidelity Freedom lncome Fund - Class K | FNSHX | Target-Date Retirement | $    921,217.14 |
| **Total** | | | **$ 13,867,554.29** |

179.    The underlying data and information reflected in the charts above are truthful, accurate, and derived from publicly available information, which was equally available to Defendants *at the beginning of the Class Period*. More specifically, the methodology utilizes observed balances as of

December 31, 2017, from the audited financials from the Plan's Form 5500 form 2017, with computations starting on October 31, 2017 (the closest quarterly end date to the start of the Class Period).

180.    Suitable replacement funds identified in the charts above were selected based on fiduciary performance measures *available in real time* to Defendants in October 2017 (not hindsight) to determine replacement funds.

181.    These identified Vanguard and American Fund TDF alternative investments are not unique in their ability to replace the challenged funds. Other meaningful benchmarks exist in addition to the Vanguard and American Funds TDFs.

182.    The following charts illustrates, based on standard investment performance metrics, other target date funds ("TDFs") in the same investment style and same investment category that could act as meaningful benchmarks to the underperforming Fidelity Freedom 2025 Active Fund (and similar charts exist for all of the Plan's TDFs):

| Description | ID | Ticker | composite | TotalAnRtn3Years | TotalAnRtn5Years | SharpeRatio5Years | BattingAverage5Years | Alpha5Years |
|---|---|---|---|---|---|---|---|---|
| American Funds 2025 Trgt Date Retire R5 | FOUSA069TP | REDTX | 2.290502208 | 7.47331 | 7.6459 | 0.82 | 0.58 | 1.67 |
| Mutual of America 2025 Retirement | FOUSA06GNJ | MURHX | 2.136276479 | 7.12681 | 7.1185 | 0.78 | 0.62 | 1.33 |
| T. Rowe Price Retirement 2025 | FOUSA0565B | TRRHX | 0.749828454 | 6.49419 | 6.5399 | 0.64 | 0.57 | -0.03 |
| TIAA-CREF Lifecycle Index 2025 Instl | F000003V02 | TLQIX | 1.325250969 | 5.9594 | 6.3732 | 0.73 | 0.58 | 0.75 |
| Vanguard Target Retirement 2025 Fund | FOUSA04B98 | VTTVX | 1.250882678 | 6.02816 | 6.2597 | 0.7 | 0.57 | 0.55 |
| TIAA-CREF Lifecycle 2025 Retirement | FOUSA05B5V | TCLFX | 0.232998514 | 5.54836 | 5.9497 | 0.63 | 0.55 | -0.13 |
| Fidelity Advisor Managed Retrmt 2025 I | FOUSA06N2Z | FIRFX | 0.836274893 | 5.84933 | 5.8847 | 0.68 | 0.57 | 0.35 |
| Schwab Target 2025 | FOUSA06O2P | SWHRX | 0.764916777 | 5.64245 | 6.1731 | 0.68 | 0.6 | 0.37 |
| American Century One Choice 2025 I | FOUSA059S6 | ARWFX | 0.882268017 | 5.06303 | 5.8715 | 0.77 | 0.57 | 1.01 |
| JHancock Multimanager 2025 Lifetime 1 | FOUSA05I24 | JLEOX | -0.423344036 | 5.50925 | 5.4453 | 0.54 | 0.5 | -1.08 |
| Empower Lifetime 2025 Inv | FOUSA08PP0 | MXELX | -0.077890889 | 5.62393 | 5.8816 | 0.59 | 0.53 | -0.57 |
| Principal LifeTime 2025 Institutional | FOUSA06PAK | LTSTX | -0.344881859 | 5.10409 | 5.5361 | 0.59 | 0.48 | -0.51 |
| Voya Index Solution 2025 Port I | FOUSA06PF6 | ISDIX | -0.307392486 | 5.17787 | 5.5006 | 0.62 | 0.5 | -0.17 |
| Fidelity Freedom 2025 | FOUSA04BCP | FFTWX | -0.38898386 | 5.34673 | 5.0366 | 0.55 | 0.48 | -0.8 |
| JPMorgan SmartRetirement 2025 R5 | FOUSA06J8B | JNSIX | 0.339595644 | 5.52538 | 6.0327 | 0.63 | 0.58 | -0.1 |
| Voya Solution 2025 Port I | FOUSA05HLO | ISZIX | 0.002386816 | 5.51449 | 5.2254 | 0.57 | 0.52 | -0.66 |
| Fidelity Advisor Freedom 2025 I | FOUSA04BD9 | FITWX | -0.755353199 | 5.1037 | 4.924 | 0.55 | 0.43 | -0.88 |
| Fidelity Freedom Index 2025 Investor | F0000043QL | FQIFX | -0.901703394 | 4.95687 | 4.9439 | 0.59 | 0.37 | -0.48 |
| MassMutual RetireSMART by JPM 2025 Svc | F000005P7X | MMISX | -1.314568656 | 4.44784 | 4.8921 | 0.48 | 0.5 | -1.75 |
| BlackRock LifePath Dyn 2025 K | F00000H3LI | LPBKX | -1.317378336 | 4.25356 | 4.7299 | 0.58 | 0.38 | -0.5 |
| Nationwide Destination 2025 R6 | FOUSA06IWN | NWHIX | -1.222676734 | 4.57701 | 5.0293 | 0.56 | 0.45 | -0.77 |
| JHancock Multi-Index 2025 Presv 1 | F00000GVEX | JREOX | -0.385714518 | 4.10095 | 5.0457 | 0.7 | 0.45 | 0.43 |
| Franklin LifeSmart 2025 Ret TrgtAdv | FOUSA05I28 | FLRFX | -0.985273833 | 5.22796 | 4.6085 | 0.5 | 0.38 | -1.28 |
| GuideStone Funds MyDestination 2025 Inv | FOUSA05K1M | GMWZX | -1.879463429 | 3.5998 | 4.7388 | 0.54 | 0.4 | -0.92 |
| Putnam RetirementReady 2025 Y | FOUSA05B1F | PRRPX | 0.413081095 | 4.67384 | 4.86 | 0.69 | 0.48 | 0.43 |

183.    This comparative TDF chart further establishes that the Freedom Funds underperformed *multiple* alternative TDFs in the same investment category that act as meaningful benchmarks for the Plan's TDF during the Class Period.

184.    Based on commonly-used, quantitative performance metrics applied to investments (Sharpe ratio, alpha, and batting average), over a five year period of time, the American EuroPacific Growth Fund R6 (RERGX) and Fidelity Freedom Funds substantially underperformed other funds, in the exact same investment category.

185.    These commonly-used performance metrics, concerning the American EuroPacific Growth Fund R6 (RERGX) and Freedom Funds' performance relative to benchmarks/peer group during the Class Period, support an inference of breach of the fiduciary duty of prudence by Defendants in maintaining the American EuroPacific Growth Fund R6 (RERGX) and Fidelity Freedom Funds for at least thirteen years through the present.

186.    These comparator TDFs - the Vanguard Fund, the American Fund TDFs, and the 2025 TDFs in the charts above therefore, "provid[e] a sound basis for comparison—a meaningful benchmark."

187.    Defendants should have realized *in real-time* in October 2017, based on these commonly-used quantitative performance metrics highlighted in the charts above that the challenged funds should have been replaced by meaningful benchmarks, like the Vanguard fund and the American Funds TDFs. *See Barchock v. CVS Health Corp.*, 886 F.3d 43, 44–45 (1st Cir. 2018) ("This "test of prudence [] is one of conduct, and not a test of the result of performance of the investment.").

188.    By failing to engage in an objectively reasonable investigation process when selecting, retaining, and failing to remove the American EuroPacific Growth Fund R6 (RERGX) and Fidelity Freedom Fund TDF investments, Defendants breached their fiduciary duties of prudence to

Plaintiff and Plan participants and are liable to Plaintiff and Class Members for the retirement monies lost by the challenged funds' poor investment performance net of fees during the Class Period.

## CLASS ACTION ALLEGATIONS

189.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

190.    In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representative of, the following Class:

> All participants and beneficiaries of the FM Global 401(k) Savings Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning October 17, 2017, and running through the date of judgment.

191.    The class includes over 5,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

192.    There are questions of law and fact common to the class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

a.    Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

b.    Whether Defendants breached their fiduciary duties to the Plan;

c.    What are the losses to the Plan resulting from each breach of fiduciary duty; and

d.    What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of fiduciary duty.

193.    Plaintiff's claims are typical of the claims of the class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a participant during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct in the same manner and under the same legal theories.

194.    Plaintiff will adequately represent the class pursuant to Federal Rule of Civil Procedure 23(a)(4), because he was a participant in the Plan during the Class period, has no interest that conflicts with the class, is committed to the vigorous representation of the Subclasses, and has engaged experienced and competent lawyers to represent the class.

195.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

196.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

197.    Plaintiff's attorneys have substantial and varied experience in complex ERISA and class action litigation and will adequately represent the Subclasses.

198. The claims brought by the Plaintiff arise from fiduciary breaches as to the Plan in its entirety and does not involve mismanagement of individual accounts.

199. The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in the individual participants' Plan. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

200. Under ERISA, an individual "participant" or "beneficiary" is distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

201. Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

**FIRST CLAIM FOR RELIEF**
**Breach of Duty of Prudence of ERISA, as Amended**
**(Plaintiff, on behalf of himself and Class, Against**
**Defendant Plan Committee – Total RKA Fees)**

202. Plaintiff restates the above allegations as if fully set forth herein.

203. Defendant Plan Committee is a fiduciary of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

204. 29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendant Plan Committee in its administration of the Plan.

205. Defendant Plan Committee, as a fiduciary of the Plan, is responsible for selecting RKA providers that charge objectively reasonable total RKA fees.

206. During the Class Period, Defendant Plan Committee had a fiduciary duty to do all of the following: ensure that the Plan's total RKA fees were objectively reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

207. During the Class Period, Defendant Plan Committee breached their fiduciary duty of prudence to Plan participants, including to Plaintiff, by failing to: ensure that the Plan's total RKA fees were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

208. During the Class Period, Defendant Plan Committee further had a continuing duty to regularly monitor and evaluate the Plan's RKA providers, Fidelity and the non-Fidelity service providers, to make sure they were providing the total RKA services at reasonable costs, given the highly competitive, commodified market surrounding RKA services and the enormous bargaining power the Plan had to negotiate the best fees, and remove Fidelity and the other non-Fidelity service providers if they provided RKA at objectively unreasonable levels.

209. During the Class Period, Defendant Plan Committee breached its duty to Plan participants, including to Plaintiff, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's RKA services critically or objectively in comparison to other RKA provider options.

210. Defendant Plan Committee's failure to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

211.    As a result of Defendant Plan Committee's breach of fiduciary duty of prudence with respect to the Plan, the Plaintiff and Plan participants suffered millions of dollars in objectively unreasonable and unnecessary monetary losses.

212.    Defendant Plan Committee is liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the FM Global Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendant Plan Committee is subject to other equitable relief as set forth in the Prayer for Relief.

**SECOND CLAIM FOR RELIEF**
**Breaches of Duty of Prudence of ERISA, as Amended**
**(Plaintiff, on behalf of himself and Class, Against Defendant Plan Committee –**
**Underperforming Investments)**

213.    Plaintiff restates the above allegations as if fully set forth herein.

214.    Defendant Plan Committee is a fiduciary of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

215.    29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendant Plan Committee in managing the investments of the Plan.

216.    Defendant Plan Committee, as a fiduciary of the Plan, is responsible for selecting and maintaining prudent investment options and taking any other necessary steps to ensure that the Plan's assets are invested prudently.

217.    During the Class Period, Defendant Plan Committee had a fiduciary duty to do all of the following: manage the assets of the Plan prudently; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

218.    During the Class Period, Defendant Plan Committee breached its fiduciary duties of prudence to Plan Participants, including Plaintiff, by failing to manage the assets of the Plan

prudently, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

219. Defendant Plan Committee, as a fiduciary of the Plan, had a continuing duty to regularly monitor and independently assess whether the Plan's investments were prudent choices for the Plan and to remove imprudent investment options regardless of how long those investments had been in the Plan.

220. During the Class Period, Defendant Plan Committee breached its fiduciary duty of prudence to Plan participants, including Plaintiff, by failing to engage in a prudent process for monitoring the Plan's investments and by failing to remove imprudent investments within a reasonable period.

221. Defendant Plan Committee was directly responsible for selecting investment options in a prudent fashion, prudently evaluating and monitoring the Plan's investments on an ongoing basis, eliminating funds that were no longer prudent, and taking all necessary steps to ensure that the Plan's assets were invested prudently and appropriately.

222. Defendant Plan Committee failed to employ a prudent process by failing to evaluate the performance and cost of the Plan's investments critically or objectively in comparison to other more reasonable investment options.

223. Defendant Plan Committee selected and retained for years as Plan investment options with low performance relative to other benchmark investment options that were readily available to the Plan at all relevant times in the same asset category and in the same investment style.

224. Defendant Plan Committee's failure to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

225.    As a result of Defendant Plan Committee's breach of its fiduciary duty of prudence with respect to the Plan, the Plaintiff and Plan participants suffered tens of million dollars in unreasonable and unnecessary monetary losses.

226.    Defendant Plan Committee is liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) for Plan-wide relief to make good to the Plan the losses resulting from its breaches, to restore to the Plan any profits Defendant Plan Committee made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendant Plan Committee is subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

**THIRD CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiff, on behalf of himself and Class, Against**
**Defendants FM Global and Board – Total RKA Fees)**

227.    Plaintiff restates the above allegations as if fully set forth herein.

228.    Defendants FM Global and Board had the authority to appoint and remove members or individuals responsible for Plan total RKA fees on the Plan Committee and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

229.    In light of this authority, Defendants FM Global and Board had a duty to monitor those individuals responsible for Plan total RKA fees on the Plan Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

230.    Defendants FM Global and Board had a duty to ensure that the individuals responsible for Plan total RKA fees possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they

based their decisions and analysis with respect to the Plan's total RKA fees; and reported regularly to Defendants FM Global and Board.

231.    The objectively unreasonable and excessive total RKA fees paid by the Plan inferentially establish that Defendants FM Global and Board breached their duty to monitor by, among other things:

a.    Failing to monitor and evaluate the performance of individuals responsible for Plan total RKA fees on the Plan Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably total RKA expenses;

b.    Failing to monitor the process by which the Plan's RKA providers, Fidelity and the other non-Fidelity service providers, were evaluated and failing to investigate the availability of more reasonably-priced RKA providers; and

c.    Failing to remove individuals responsible for Plan total RKA fees on the Plan Committee whose performance was inadequate in that these individuals continued to pay the same total RKA costs over numerous years even though solicitation of competitive bids would have shown that maintaining Fidelity and the other non-Fidelity service providers as the RKA providers at the contracted price was imprudent, excessively costly, all to the detriment of the Plaintiff's and other Plan participants' retirement savings.

232.    As the consequences of the breaches of the duty to monitor for total RKA fees the Plaintiff and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

233.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants FM Global and Board are liable to restore to the FM Global Plan all losses caused by their failure to adequately monitor individuals responsible for Plan total RKA fees on the Plan Committee. In addition, Plaintiff and the Class are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**FOURTH CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiff, on behalf of himself and Class, Against Defendants FM Global and Board**
**- Underperforming Investments)**

234.   Plaintiff restates the above allegations as if fully set forth herein.

235.   Defendants FM Global and Board had the authority to appoint and remove members or individuals responsible for Plan investment performance on the Plan Committee and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

236.   In light of this authority, Defendants FM Global and Board had a duty to monitor those individuals responsible for Plan investment performance on the Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

237.   Defendants FM Global and Board had a duty to ensure that the individuals responsible for investment performance on the Plan Committee possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants FM Global and Board.

238.   The objectively unreasonable underperformance by the challenged funds, inferentially suggest that Defendants FM Global and Board breached their duty to monitor by, among other things:

   a.   Failing to monitor and evaluate the performance of individuals responsible for Plan investment performance on the Plan Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses;

   b.   Failing to monitor the process by which the Plan investments were evaluated and failing to investigate the availability of better-performing funds; and

    c.    Failing to remove individuals responsible for Plan investment performance on the Plan Committee whose performance was inadequate in that these individuals continued to retain the same underperforming investments even though other comparable plans had better-performing and reasonable prudent alternative investments in the same asset categories, all to the detriment of the Plan and Plan participants' retirement savings.

239.    As the consequences of the foregoing breaches of the duty to monitor for investment performance, the Plaintiff and Plan participants suffered tens of millions of dollars of objectively unreasonable and unnecessary monetary losses.

240.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants FM Global and Board are liable to restore to the FM Global Plan all losses caused by their failure to adequately monitor individuals responsible for Plan investment performance. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.    A Declaration the Defendants are fiduciaries, have breached their fiduciary duty of prudence under ERISA, causing harm to Plan participants and beneficiaries;

D.    An Order compelling Defendants to make good to Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to Plan all losses resulting from paying unreasonable total RKA fees and retaining underperforming investments, and restoring to Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An Order requiring FM Global to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against FM

Global as necessary to effectuate relief, and to prevent FM Global's unjust enrichment;

F.    An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary/consultant or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H.    An award of pre-judgment interest;

I.    An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.    Such other and further relief as the Court deems equitable and just.

Respectfully submitted,

Date: January 19, 2024

**WALCHESKE & LUZI, LLC**

/s/Paul M. Secunda
Paul M. Secunda*
*Admitted Pro Hac Vice*
235 N. Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (414) 828-2372
psecunda@walcheskeluzi.com

*Attorneys for Plaintiff and Proposed Class*

**JONATHAN M. FEIGENBAUM, ESQ.**

Jonathan M. Feigenbaum
184 High Street, Suite 503
Boston, MA 02110
Telephone: (617) 357-9700
E-Mail: jonathan@erisaattorneys.com

**CERTIFICATE OF SERVICE**

I hereby certify that on January 19, 2024, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the Court's CM/ECF system, which will send notification to all counsel of record.

/s/Paul M. Secunda
Paul M. Secunda