UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| EDWARD CURE and JEFFREY COOPER, *individually, and as representatives of a Class of Participants and Beneficiaries of the FM Global 401(k) Savings Plan*, <br><br> Plaintiffs, <br><br> v. <br><br> FACTORY MUTUAL INSURANCE COMPANY, BOARD OF DIRECTORS OF FACTORY MUTUAL INSURANCE COMPANY, and FACTORY MUTUAL INSURANCE COMPANY RETIREMENT COMMITTEE, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 1:23-cv-12399-JEK |

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS**

**KOBICK, J.**

Plaintiffs Edward Cure and Jeffrey Cooper have filed this putative class action alleging that defendants Factory Mutual Insurance Company ("FM Global"), its Board of Directors, and its Retirement Committee breached certain fiduciary duties owed to the FM Global 401(k) Savings Plan (the "Plan") under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et. seq*. In particular, the plaintiffs claim that the Retirement Committee improperly allowed the Plan to pay excessive recordkeeping and administrative fees and imprudently selected and retained underperforming investments, while FM Global and its Board of Directors failed to adequately monitor the Committee. Pending before this Court is the defendants' motion to dismiss the second amended complaint. Their motion will be granted in part and denied in part. The plaintiffs fail to plausibly allege that the Committee's retention of the American Funds Europacific

Growth Fund R6 was imprudent. That underperforming investment claim, and the corresponding claim for failure to properly monitor the Committee's retention of that fund, will accordingly be dismissed. The defendants' motion to dismiss will otherwise be denied.

## BACKGROUND

The pertinent facts, drawn from the complaint and those documents incorporated by reference therein, are as follows and presumed true for purposes of the motion to dismiss. *See Parmenter v. Prudential Ins. Co. of Am.*, 93 F.4th 13, 18 (1st Cir. 2024).

**I.      The Parties and the Plan.**

FM Global is an insurance company headquartered in Johnston, Rhode Island, with offices around the globe, including in Massachusetts. ECF 21, ¶ 39. Plaintiffs Edward Cure and Jeffrey Cooper are former FM Global employees who participated in the Plan. *Id.* ¶¶ 29-34. At FM Global, Cure worked as a Compensation Manager and Supervisor in Rhode Island from April 2018 through April 2023, while Cooper served as an Accountant III in Massachusetts from March 2020 until January 2022. *Id.* ¶¶ 30, 33. They seek to represent, pursuant to 29 U.S.C. § 1132(a)(2), a class comprising "[a]ll participants and beneficiaries of the FM Global 401(k) Savings Plan . . . beginning October 17, 2017, and running through the date of judgment." *Id.* ¶¶ 193-94.

The Plan is a Section 401(k) "defined contribution plan" pursuant to 29 U.S.C. § 1002(34), *id.* ¶ 2, "meaning that participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses . . . such as management or administrative fees," *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). The Plan's fiduciaries select the investment options and service providers. ECF 21, ¶ 3. As fiduciaries of the Plan under 29 U.S.C. § 1002(21)(A), FM Global and its Board of Directors appointed and assigned their duties to the Retirement Committee.

*Id.* ¶¶ 4, 40. The Committee, in turn, administers, controls, manages, and is responsible for the day-to-day operations of the Plan pursuant to 29 U.S.C. § 1102(a). *Id.* ¶ 41. In 2021, the Plan had over $1.8 billion in assets and 5,212 participants—more assets and participants than over 99% of defined contribution plans nationwide. *Id.* ¶¶ 42-43.

**II.      Recordkeeping and Administrative Fees.**

Large 401(k) plans hire service providers, known as recordkeepers, to assist them with administrative tasks. *Id.* ¶¶ 45, 57. Recordkeepers offer a variety of services to 401(k) plans, including (1) "bundled" services, such as recordkeeping, transaction processing, communications with participants, and compliance support; (2) "a la carte" services, which include loan processing as well as brokerage and distribution services; and (3) "ad hoc" services for other administrative transactions. *Id.* ¶¶ 50, 66, 68. In exchange, recordkeepers charge the plans recordkeeping and administrative fees. *Id.* ¶¶ 6, 53. The fees are either collected directly from plan participants or indirectly through revenue sharing. *Id.* ¶¶ 47, 53, 55.

For "mega" 401(k) plans like the FM Global 401(k) Savings Plan, recordkeeping services are largely standardized because the recordkeeper must provide its services at scale and in accordance with regulatory requirements. *Id.* ¶¶ 60, 62, 75. Recordkeeping and administrative services for these plans "are essentially fungible and the market for them is highly competitive" because the "market is filled with equally capable recordkeepers" that provide comparable services. *Id.* ¶ 64. Thus, recordkeepers strive to differentiate themselves to prospective customers based on price. *Id.* ¶ 63. The "standard and prevailing practice" for retirement plan consultants and advisors is to request competitive bids from recordkeepers every three to five years in order to compare different service providers' fees. *Id.* ¶¶ 73-74, 87-89.

Since 2017, the Retirement Committee has paid Fidelity Investments Institutional to provide the Plan's recordkeeping and administrative services. *Id.* ¶¶ 6, 101. Between 2017 and 2022, participants in comparator plans paid recordkeeping and administrative fees of between $43 and $49 per year, whereas the Plan's participants paid an effective average annual fee of $120. *Id.* ¶¶ 101, 140-43. In 2018, for example, Fidelity's total annual recordkeeping and administrative fee was $91 per participant, while five "other similarly-sized comparable plans" paid fees of $43, $45, or $49 per participant. *Id.* ¶ 102. Accordingly, since mid-October 2017, Plan participants have allegedly paid 139% more for "materially similar" recordkeeping and administrative services. *Id.* ¶ 141.

The "most plausible explanation of the disparity" is, in the plaintiffs' view, "that the Plan's fiduciaries engaged in imprudent conduct." *Id.* ¶ 127. Since mid-October 2017, they allege, the Committee has failed to solicit bids from competing service providers and to effectively leverage its "massive size" to negotiate lower recordkeeping and administrative expenses. *Id.* ¶ 6; *see id.* ¶¶ 65, 73. It has also allegedly failed to conduct "an adequate investigation" into whether the fees charged by Fidelity were excessive. *Id.* ¶ 20.

**III.    Underperforming Investments.**

The Retirement Committee is additionally responsible for monitoring all of the investment options made available to Plan participants and removing those investment options that are, based on qualitative and quantitative metrics, underperforming. *Id.* ¶¶ 80-81, 84-86. The plaintiffs allege that, for over a decade, the Committee selected and retained two underperforming funds for investors in the Plan: the American Funds Europacific Growth Fund R6 and the active suite of Fidelity Freedom Funds Class K. *Id.* ¶¶ 7, 156, 161-62. The suite of Fidelity Freedom Funds are "target date funds," which describes "an investment vehicle that offers an all-in-one retirement

solution through a portfolio of underlying funds that gradually shifts to become more conservative as the assumed target retirement year approaches." *Id.* ¶ 158. Target date funds like the Fidelity Freedom Funds suite are actively managed because the funds' "glide paths"—that is, their allocations of stocks, bonds, and other assets—are designed to change over time. *Id.* ¶ 159.

The plaintiffs allege that the Retirement Committee failed to "engage in an objectively reasonable investigation" when selecting and retaining the American Funds Europacific Growth Fund R6 and the active suite of Fidelity Freedom Funds, and failed to replace the Funds with "better perform[ing]" comparable alternative investments. *Id.* ¶¶ 162, 172-73, 186-87, 192. By failing to heed quantitative performance metrics and retaining the underperforming Funds, the plaintiffs claim, the Committee has "cost Plan participants tens of millions of dollars" in lost compounded returns since mid-October 2017. *Id.* ¶¶ 7, 187-92.

### IV.  Procedural History.

The plaintiffs initiated this lawsuit in October 2023 and filed the operative second amended class action complaint in February 2024. ECF 1, 21. That complaint asserts four ERISA claims: two claims against the Retirement Committee under 29 U.S.C. §§ 1109(a) and 1132(a)(2) for breach of the duty of prudence concerning total recordkeeping and administrative fees (Count I) and underperforming investments (Count II); and two claims against FM Global and its Board, likewise under 29 U.S.C. §§ 1109(a) and 1132(a)(2), for failure to adequately monitor the Retirement Committee's decisions regarding those fees (Count III) and investments (Count IV). ECF 21, ¶¶ 205-43. The defendants moved to dismiss the complaint for failure to state a claim.

### STANDARD OF REVIEW

In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must determine "'whether, construing the well-pleaded facts of the complaint in the light most

5

favorable to the plaintif[f], the complaint states a claim for which relief can be granted.'" *Cortés-Ramos v. Martin-Morales*, 956 F.3d 36, 41 (1st Cir. 2020) (quoting *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 7 (1st Cir. 2011)). The complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679.

## DISCUSSION

Under ERISA, a fiduciary must act "solely in the interest of the [plan's] participants and beneficiaries and . . . for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). A fiduciary must also act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." *Id.* § 1104(a)(1)(B). The statute, in other words, "'imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets.'" *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 419 (2014) (quoting *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 143 n.10 (1985)). "This fiduciary duty of prudence governs the [defendants'] conduct" here and includes an obligation to, among other things, "monitor all plan investments and remove any imprudent ones." *Hughes v. Nw. Univ.*, 595 U.S. 170, 172-73 (2022); *see* 29 U.S.C. § 1104(a)(1)(C). "A fiduciary who breaches that duty must 'make good' to the plan

6

'any losses to the plan resulting from such breach.'" *Brotherston v. Putnam Investments, LLC*, 907 F.3d 17, 30 (1st Cir. 2018) (quoting 29 U.S.C. § 1109(a)).

"A claim for breach of a fiduciary duty under ERISA includes proving a breach, a loss, and the causal connection between the two." *Parmenter*, 93 F.4th at 19. "Because the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts," *Dudenhoeffer*, 573 U.S. at 425 (quoting 29 U.S.C. § 1104(a)(1)(B)), courts must engage in a "context-specific inquiry" to assess whether a complaint states a claim of imprudence, *Hughes*, 595 U.S. at 173. That inquiry focuses on the fiduciary's conduct rather than examining "'the result of performance of the investment.'" *Barchock v. CVS Health Corp.*, 886 F.3d 43, 44-45 (1st Cir. 2018) (quoting *Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 7 (1st Cir. 2009)). "'Whether a fiduciary's actions are prudent cannot be measured in hindsight.'" *Bunch*, 555 F.3d at 7 (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 424 (4th Cir. 2007)).

**I.    Claims Against the Retirement Committee.**

    A.    Recordkeeping and Administrative Fees.

Count I alleges that the Retirement Committee breached its duty of prudence by failing to "ensure that the Plan's total [recordkeeping and administrative] fees were objectively reasonable" and by failing "to evaluate the cost of the Plan's [recordkeeping and administrative] services critically or objectively in comparison to other . . . provider options." ECF 21, ¶¶ 210, 212. The Committee, in other words, allegedly "violated [its] duty of prudence by . . . paying excessive recordkeeping fees," *Hughes*, 595 U.S. at 172, which "can sometimes significantly reduce the value of an account in a defined-contribution plan," *Tibble*, 575 U.S. at 525. To prevail on this imprudence claim, the plaintiffs must "plausibly alleg[e] that the higher fees were unjustified or

otherwise improper." *Velazquez v. Mass. Fin. Servs. Co.*, 320 F. Supp. 3d 252, 259 (D. Mass. 2018).

The plaintiffs adequately state an imprudence claim against the Retirement Committee for excessive recordkeeping and administrative fees. According to the complaint, the Retirement Committee "could have obtained the materially same [t]otal [recordkeeping and administrative] services for less" had it properly solicited bids from competing service providers or effectively leveraged its "massive size" to negotiate lower fees. *Id.* ¶¶ 6, 42, 65, 73, 150. As a result, between 2017 and 2022, Plan participants allegedly paid an average annual recordkeeping and administrative fee of $120, while comparator plan participants paid approximately $46 each year. *Id.* ¶¶ 101, 140. This amounts to more than a 139% premium per Plan participant since October 17, 2017. *Id.* ¶ 6. These allegations are, as this Court has repeatedly held, sufficient to state a plausible claim. *See, e.g.*, *Somers v. Cape Cod Healthcare, Inc.*, No. 1:23-cv-12946-MJJ, 2024 WL 4008527, at *4 (D. Mass. Aug. 30, 2024) ("Plaintiffs' assertion that Defendants demonstrated imprudent monitoring by subjecting Plan participants to recordkeeping fees at prices well higher than those of comparable plans is sufficient[.]"); *Daggett v. Waters Corp.*, No. 23-cv-11527-JGD, 2024 WL 1677421, at *9 (D. Mass. Apr. 18, 2024) ("[A]llegation that the [plan] failed to 'leverag[e] its substantial size' to obtain 'the materially same total [recordkeeping and administrative] services for less' allows, at this stage, for an inference of imprudence." (citation omitted)); *Brown v. MITRE Corp.*, No. 22-cv-10976-DJC, 2023 WL 2383772, at *5 (D. Mass. Mar. 6, 2023) (denying motion to dismiss given "allegations regarding the [p]lan's failure to leverage its size to obtain lower recordkeeping fees for the same services"); *Turner v. Schneider Elec. Holdings, Inc.*, 530 F. Supp. 3d 127, 136-37 (D. Mass. 2021) (allegations that defendant

"acted imprudently by failing to conduct a competitive bidding process" and "not leverag[ing] the [p]lan's size to negotiate lower fees . . . are sufficient to state a claim").

The defendants nonetheless contend that the plaintiffs have not met their burden to state such a claim for two reasons. First, they argue that the plaintiffs' seven-step calculation of the Plan's total recordkeeping and administrative fees is flawed. Based on their review of the Plan's U.S. Department of Labor Form 5500s from 2017 through 2021, upon which the plaintiffs primarily rely,[1] the defendants contend that the Plan paid less than what the complaint alleges. In the defendants' assessment, the Form 5500s show credits or rebates to the Plan that diminish the excessive fee allegations in the complaint. The pleading stage is not, however, the appropriate juncture to resolve factual disputes about the parties' disparate fee calculations. *See Somers*, 2024 WL 4008527, at *4 ("[T]he Court does not delve into the parties' differing formulas to determine recordkeeping fees[.]"); *Daggett*, 2024 WL 1677421, at *10 (improper "to engage in a factual—and potentially expert—analysis [regarding recordkeeping and administrative fees] . . . at the motion to dismiss stage"). Whether the plaintiffs accurately calculate the Plan's fees, as they allege, or inflate those fees, as the defendants contend, is a question of fact to be addressed after discovery.

Second, the defendants argue that the complaint does not plausibly allege a "meaningful benchmark" by which to compare the Plan's fees. ECF 27, at 21-26; ECF 32, 13-17. They rely on precedent outside of this Circuit holding that "a complaint cannot simply make a bare allegation

---

[1] The Court can consider the Form 5500s, *see* ECF 26-1 through 26-5, because they are "'incorporated by reference into the complaint,'" *Parmenter*, 93 F.4th at 18 (quoting *N.R. by & through S.R. v. Raytheon Co.*, 24 F.4th 740, 746 (1st Cir. 2022)); *see* ECF 21, ¶ 72 (describing fee calculation as relying on these Forms); *Daggett*, 2024 WL 1677421, at *2 n.4 (considering Form 5500s, "which are 'routinely considered on motions to dismiss in the ERISA context'" (citation omitted)).

that costs are too high, or returns are too low," and instead "'must provide a sound basis for comparison—a meaningful benchmark.'" *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 484 (8th Cir. 2020) (citation omitted); *accord Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1148 (10th Cir. 2023); *Albert v. Oshkosh Corp.*, 47 F.4th 570, 581 (7th Cir. 2022), *reh'g denied*, No. 21-2789, 2022 WL 4372363 (7th Cir. Sept. 21, 2022); *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1167 (6th Cir. 2022). But the First Circuit has not adopted this approach, and numerous sessions in this District have rejected it. *See, e.g.*, *Brookins v. Ne. Univ.*, No. 22-cv-11053-NMG, 2024 WL 1659507, at *4 (D. Mass. Apr. 17, 2024) ("To engage in meaningful benchmark analysis, this Court would be required to consider the merits substantively in a manner that would conflict with the Court's obligation to draw all reasonable inferences in favor of the plaintiff."); *Somers*, 2024 WL 4008527, at *5 ("[T]he Court will not delve into disputes regarding the appropriateness of benchmarks at this stage."); *Daggett*, 2024 WL 1677421, at *10 (same); *Sellers v. Trs. of Coll.*, 647 F. Supp. 3d 14, 30 (D. Mass. 2022) (same); *In re Biogen, Inc. ERISA Litig.*, No. 20-cv-11325-DJC, 2021 WL 3116331, at *6 (D. Mass. July 22, 2021) (same).

The Court agrees that it is inappropriate, at the pleading stage, to resolve whether the plaintiffs have, in fact, offered proper benchmarks. For purposes of this motion to dismiss, they plausibly allege that the Plan's total annual recordkeeping and administrative fees were significantly higher than the "fees paid by other similarly-sized comparable plans" that "receiv[ed] a materially similar level and quality" of total recordkeeping and administrative services. ECF 21, ¶ 102. Those five other plans had between 3,639 and 6,395 participants, which is comparable—albeit not identical—to the Plan's 4,947 participants. *Id.* "To ensure . . . apples-to-apples comparisons," the plaintiffs relied on those plans' publicly available Form 5500s and "used the same methodology to compare the fees of the Plan with the fees of other similarly situated and

10

comparable plans." *Id.* ¶¶ 103-04. While acknowledging that "some of the comparators utilize different service or compensation codes for the services received on the 5500 Form," the plaintiffs allege that total recordkeeping and administrative "fees are fungible and commoditized and any differences between the plans in these codes are immaterial from a pricing perspective." *Id.* ¶ 136.

The defendants maintain, however, that the plaintiffs' comparisons are deficient because the fee calculations for the comparator plans, unlike those for the Plan, sometimes exclude fees for recordkeeping or investment services, which in turn understates the other plans' fees. They also contend that the complaint lacks factual support for its allegation that recordkeepers for the other plans rendered the same types and quality of recordkeeping and administrative services. But the defendants' concerns about the comparators, once again, raise factual disputes that cannot be resolved on a motion to dismiss, when well-pleaded facts are presumed true and reasonable inferences are drawn in favor of the plaintiffs. *See Daggett*, 2024 WL 1677421, at *10 n.18 ("Further discovery and analysis by the parties is appropriate" because the Form 5500 materials "paint an incomplete picture and are far from dispositive in resolving the factual issues the parties raise."). At the pleading stage, it is inappropriate to decide whether these are "apples-to-apples" comparisons, as the complaint alleges, or "apples-to-oranges" comparisons, as the defendants suggest. *Compare* ECF 21, ¶¶ 71, 89, 104, *with* ECF 27, at 3. Accordingly, the defendants' motion to dismiss Count I is denied.

B.   <u>Underperforming Investments.</u>

Count II alleges that the Retirement Committee breached its duty of prudence "by failing to manage the assets of the Plan prudently," "to engage in a prudent process for monitoring the Plan's investments," and "to remove imprudent investments"—namely, the American Funds Europacific Growth Fund R6 and the active suite of Fidelity Freedom Funds—"within a reasonable

period." ECF 21, ¶¶ 161, 221, 223. A plan fiduciary like the Committee is "required to conduct [its] own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *Hughes*, 595 U.S. at 176. This "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones." *Tibble*, 575 U.S. at 530. A fiduciary breaches that duty if it "fail[s] to remove an imprudent investment from the plan within a reasonable time." *Hughes*, 595 U.S. at 176. The relevant inquiry is whether the complaint raises a reasonable inference that the Retirement Committee considered all relevant information in selecting and retaining the Funds. *See Sellers*, 647 F. Supp. 3d at 29. If the Committee "'fail[ed] to investigate and evaluate the merits of [its] investment decisions,'" it acted imprudently. *In re Biogen*, 2021 WL 3116331, at *5 (quoting *DiFelice*, 497 F.3d at 420).

The plaintiffs fail to plausibly allege that the Committee's offering and retention of the American Funds Europacific Growth Fund R6 was imprudent. The only relevant factual allegations in the complaint are that the Vanguard International Growth Fund "is a materially simila[r] and better performing alternative prudent investment," and that the Committee's failure to investigate the American Funds Europacific Growth Fund R6 and replace it with an alternative prudent investment fund caused the Plan to lose approximately $7.9 million from October 2017 to March 2023. ECF 21, ¶¶ 162, 179-80. The First Circuit has explained, however, that the prudence inquiry assesses the fiduciaries' behavior rather than the investment's performance. *Barchock*, 886 F.3d at 44-45. And the complaint lacks any factual allegations indicating that the inclusion of the American Funds Europacific Growth Fund R6 was imprudent from the outset, without the benefit of hindsight. *See Bunch*, 555 F.3d at 7; *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018) ("The fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether the [challenged funds] were an imprudent choice at the

12

outset."). It does not cite, for example, any evidence of either fund's performance during the class period or identify information that the Committee would have been aware of over this time. The plaintiffs have, accordingly, failed to state a plausible imprudence claim stemming from the alleged underperformance of the American Funds Europacific Growth Fund R6.

The plaintiffs do, however, adequately allege that the Committee's offering and retention of the active suite of Fidelity Freedom Funds was imprudent. The Committee's failure to examine or remove the Fidelity Freedom Funds allegedly cost Plan participants over $13 million between October 2017 and August 2023. ECF 21, ¶ 182. The complaint alleges that the American Funds Target Date Retirement suite "is a materially similar and better performing alternative prudent investment." *Id.* ¶ 181. It also includes a chart showing that, over a period of three and five years, the Fidelity Freedom 2025 Active Fund, as an exemplar of the Fidelity Freedom Funds, underperformed thirteen comparable target date funds, including the American Funds, but outperformed the eleven other comparators. *Id.* ¶ 186.[2] It further alleges that the Fidelity Freedom Funds "underwent a strategy overhaul in 2013 and 2014" in "a departure from . . . accepted wisdom" that permitted "its portfolio managers to attempt to time market shifts to locate underpriced securities," which, in turn, "heaped further unnecessary risk on investors." *Id.* ¶¶ 163-65. A March 2018 article from *Reuters*, incorporated by reference into the complaint, observed that many investors had lost confidence in the Fidelity Freedom Funds "'because of their history of underperformance, frequent strategy changes and rising risk.'" *Id.* ¶ 166. The report also stated

---

[2] This example of Fidelity Freedom Funds' middling performance is not sufficient, standing alone, to infer imprudence. *See Smith*, 37 F.4th at 1166 ("Nor does a showing of imprudence come down to simply pointing to a fund with better performance."); *Lalonde v. Massachusetts Mut. Ins. Co.*, 728 F. Supp. 3d 141, 155 (D. Mass. 2024) (dismissing imprudence claim alleging "a modest differential in performance" "between the proprietary funds and alleged comparator funds"). The plaintiffs have, however, included additional allegations supporting their claim of imprudence.

that "Fidelity ha[d] seen nearly $16 billion in net withdrawals over the past four years" in an "exodus stem[ming] in part from unease with the way . . . Fidelity ha[d] boosted performance—by ramping up risk," and that "[o]f the top five target-date providers, Fidelity was the only one to have net withdrawals in 2016 and 2017." ECF 26-11, at 2-3. On the other hand, the report stated that the Fidelity Freedom Funds' mutual funds had "outperformed at least 85 percent of their competitors" for three years, and that those Funds' "1-year and 3-year returns bea[t] internal benchmarks." *Id.* at 2, 4. On balance, however, the plaintiffs' allegations and the *Reuters* article, taken as a whole, support a plausible claim that the Committee should have been aware of Fidelity's changed investment strategy, including its increased risks, and did not meet the objectively prudent person standard in continuing to offer the Fidelity Freedom Funds active suite to Plan participants. *Accord Daggett*, 2024 WL 1677421, at *13; *Sellers*, 647 F. Supp. 3d at 33; *In re Biogen*, 2021 WL 3116331, at *6.

The defendants' counterarguments are unpersuasive. They contend that the complaint improperly attempts to extrapolate poor performance by using only the 2025 vintage, as opposed to the other thirteen Fidelity Freedom Funds, because that vintage reflects a more "conservative" portfolio "as the assumed target retirement year [of 2025] approaches." ECF 21, ¶¶ 156, 158, 186. The complaint also alleges, however, that "similar charts exist for all of the Plan's" target date funds. *Id.* ¶ 186. Whether the 2025 vintage is an adequate representation of the performance of the other Fidelity Freedom Funds presents a question of fact that cannot be resolved on a motion to dismiss. The defendants' related concern that the five-year period depicted by the chart is inadequate to compare investments does not pass muster at the pleading stage, either. *See In re Biogen*, 2021 WL 3116331, at *6 ("Disputes over the appropriateness of" the "five-year bracket for performance comparisons" "are inappropriate at the motion to dismiss stage."). Nor will the

14

Court impose, as the defendants urge, a minimum threshold for what constitutes sufficient underperformance to raise an inference of imprudence. Finally, the defendants reiterate that the complaint lacks sufficient details about the comparable funds—such as their investment strategy, asset mix, or risk profile—to justify treating them as "meaningful benchmarks." ECF 27, at 12-15; ECF 32, 8-11.[3] But again, it is premature at this juncture to decide the benchmark issue. *See Sellers*, 647 F. Supp. 3d at 30. Whether it was prudent for the Committee to retain the Fidelity Freedom Funds remains a fact-specific inquiry that requires discovery. *See Daggett*, 2024 WL 1677421, at *13.

## II. Claims Against FM Global and Its Board of Directors.

Count III alleges that FM Global and its Board of Directors—which has the authority to appoint and remove members of the Retirement Committee—failed to properly monitor the Committee's acceptance of excessive total recordkeeping and administrative fees for the Plan. ECF 21, ¶¶ 231-34, 238-40. Count IV alleges that FM Global and its Board of Directors also failed to adequately monitor the Committee's selection and retention of the underperforming investments. *Id.* ¶ 241. These failure-to-monitor claims are entirely derivative of the plaintiffs' underlying claims of imprudence against the Committee. *See Brotherston*, 907 F.3d at 24 n.5 (treating failure to monitor claim "as subsumed within plaintiffs' fiduciary duty claims").[4] Because

---

[3] The defendants also assert that the complaint does not explain why some of the comparators are passively managed index funds, even though the Fidelity Freedom Funds are actively managed. *See* ECF ¶¶ 161, 186. Such parsing, however, is appropriately addressed after discovery, not on a motion to dismiss. *See* ECF 56, *Monteiro v. The Child's Hosp. Corp.*, No. 22-cv-10069-AK (D. Mass. Mar. 15, 2023) (denying motion to dismiss where the complaint "compare[d] the Active Suite to passively-managed target date funds (the 'Index Suite')"); *In re Biogen*, 2021 WL 3116331, at *5 (same where plaintiffs "use[d] the Index suite as a benchmark to demonstrate that the Freedom Funds underperformed").

[4] The defendants aver in their initial memorandum that the claims for failure to monitor should also be dismissed as conclusory. ECF 27, at 29. But they concede in their reply that those claims

the plaintiffs have, as explained, stated viable imprudence claims against the Retirement Committee for the Plan's allegedly excessive recordkeeping and administrative fees and retention of the active suite of Fidelity Freedom Funds, they have also plausibly alleged derivative claims concerning the failure of FM Global and its Board of Directors to monitor the Committee. *See, e.g.*, *Brookins*, 2024 WL 1659507, at *6; *Daggett*, 2024 WL 1677421, at *11, *14; *Tracey v. Mass. Inst. of Tech.*, No. 16-cv-11620-NMG, 2017 WL 4478239, at *4 (D. Mass. Oct. 4, 2017) ("To the extent that plaintiffs have plausibly alleged that defendants breached their fiduciary duties directly, plaintiffs have also plausibly alleged that defendants have breached their duty to monitor."). And since the plaintiffs do not plausibly allege that the Committee's retention of the American Funds Europacific Growth Fund R6 was imprudent, their derivative claim for failure to monitor the Committee's decisions regarding that Fund will be dismissed.

## CONCLUSION AND ORDER

For the foregoing reasons, the defendants' motion to dismiss the plaintiffs' second amended class action complaint, ECF 25, is GRANTED in part and DENIED in part. Counts I and III remain in their entirety. Counts II and IV are dismissed with respect to the plaintiffs' claims about the American Funds Europacific Growth Fund R6 but not as to the active suite of Fidelity Freedom Funds.

SO ORDERED.

Dated: January 31, 2025

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

---

"stand or fall with" the "derivative . . . underlying claims for breach of fiduciary duty." ECF 32, at 20.